# In the United States Court of Appeals for the District of Columbia Circuit

---

THE COALITION TO STOP CPKC,
*Petitioner,*

v.

SURFACE TRANSPORTATION BOARD AND UNITED STATES OF AMERICA,
*Respondents,*

CANADIAN PACIFIC KANSAS CITY LIMITED,
*Intervenor.*

---

On Petition for Review of Final Action
of the Surface Transportation Board
(No. FD 36500)

---

**INITIAL BRIEF FOR RESPONDENT-INTERVENOR
CANADIAN PACIFIC KANSAS CITY LIMITED**

---

C. ANDREW GERLACH
MAXWELL F. GOTTSCHALL
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4789

ADAM S. PARIS
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, CA 90067
(310) 712-6663

DAVID L. MEYER
LAW OFFICE OF DAVID L. MEYER
1105 S Street NW
Washington, DC 20009
(202) 294-1399
david@meyerlawdc.com

JEFFREY B. WALL
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500
wallj@sullcrom.com

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28, respondent-intervenor Canadian Pacific Kansas City Limited (CPKC) respectfully submits this certificate as to parties, rulings, and related cases.

## A.    Parties

All parties, intervenors, and amici appearing in this court are listed in the brief for the Surface Transportation Board and United States.

## B.    Rulings Under Review

References to the rulings at issue appear in the brief for the Surface Transportation Board and United States.

## C.    Related Cases

This case was originally filed in the United States Court of Appeals for the Seventh Circuit, *see* No. 23-1894 (7th Cir. May 11, 2023), before being transferred to this Court.

Challenges to the same agency action were commenced in this Court by two other parties, Union Pacific Railroad Company and Commuter Rail Division of the Regional Transportation Authority (d/b/a Metra), but both later voluntarily dismissed their petitions. *Union Pacific Railroad Company* v. *STB*, No. 23-1125 (D.C. Cir. Jan. 29, 2024); *Commuter Rail Division of the Regional Transportation Authority d/b/a Metra* v. *STB*, No. 23-1274 (D.C.

Cir. July 26, 2024). Metra had also filed an earlier petition that this Court dismissed as jurisdictionally premature. *See* No. 23-1131 (D.C. Cir. Aug. 3, 2023). CPKC is not aware of any other related case in this Court or in any other court.

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, respondent-intervenor Canadian Pacific Kansas City Limited makes the following disclosure.

Canadian Pacific Kansas City Limited has no parent company and no publicly held company holds a 10% or greater ownership interest.

Canadian Pacific Kansas City Limited is a transportation holding company that, together with its subsidiaries, owns and operates a transcontinental freight railway in the United States, Canada, and Mexico.

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .................................................................................i

CORPORATE DISCLOSURE STATEMENT ............................... iii

GLOSSARY ..........................................................................ix

INTRODUCTION ..................................................................1

STATEMENT OF THE ISSUES ..............................................3

STATEMENT OF THE CASE ..................................................3

STATUTES AND REGULATIONS...........................................3

SUMMARY OF ARGUMENT..................................................3

STANDARD OF REVIEW .......................................................6

ARGUMENT .........................................................................6

I.   The Board Had Substantial Evidence For Its Conclusion That The Merger Was Unlikely To Cause Disruption To Metra's Commuter-Rail Service In The Coalition Communities..........................7

     A.   The Board Had Substantial Evidence For Its Conclusion That The Merger Would Add Only Eight Additional Trains To The MD-W Line..........................................................8

     B.   The Evidence Showed That Delays To Metra Are Unlikely To Worsen From Eight Additional Freight Trains.....................13

     C.   The Coalition's Focus On Pre-Transaction Delays Does Not Undermine The Board's Conclusion .......................................16

II.  The Board Fully Complied With NEPA .................................18

     A.   The Board Sufficiently Considered Road Crossing Delays In The Coalition Communities .......................................21

    B.     The Board Sufficiently Considered Passenger Rail Delays ........32

    C.     The Board Sufficiently Considered Track-Crossing Issues At Metra Stations ..............................................................................33

III.    The Board's Decision Did Not Violate The APA Or ICCTA .................34

IV.    At Most, Remand Without Vacatur Would Be The Appropriate Remedy Here ...........................................................................................37

    A.     Vacatur Would Cause Extraordinary Disruption ........................38

    B.     The Board Is Likely To Reach The Same Decision On Remand ............................................................................................42

CONCLUSION....................................................................................................44

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Advocates for Highway & Auto Safety* v. *Federal Motor Carrier Safety Admin.*,
429 F.3d 1136 (D.C. Cir. 2005)...........................................................41

*American Great Lakes Ports Ass'n* v. *Schultz*,
962 F.3d 510 (D.C. Cir. 2020)......................................................38, 41

*American Bankers Ass'n* v. *National Credit Union Administration*,
934 F.3d 649 (D.C. Cir. 2019).....................................................37, 40

*BNSF Ry. Co.* v. *STB*,
526 F.3d 770 (D.C. Cir. 2008).............................................................11

*Department of Transp.* v. *Public Citizen*,
541 U.S. 752 (2004)...............................................................................20

*El Puente* v. *U.S. Army Corps of Eng'rs*,
100 F.4th 236 (D.C. Cir. 2024).........................................................26

*Eagle County* v. *STB*,
82 F.4th 1152 (D.C. Cir. 2023)....................................................16, 17

*Friends of the River* v. *FERC*,
720 F.2d 93 (D.C. Cir. 1983)................................................................33

*Glass Packaging Institute* v. *Regan*,
737 F.2d 1083 (D.C. Cir. 1984)...........................................................20

*Grainbelt Corp.* v. *STB*,
109 F.3d 794 (D.C. Cir. 1997).............................................................6, 8

*Hanly* v. *Mitchell*,
460 F.2d 640 (2d Cir. 1972) ................................................................20

*Heartland Reg'l Med. Ctr.* v. *Sebelius*,
566 F.3d 193 (D.C. Cir. 2009)...........................................................37

*Lamoille Valley R.R. Co.* v. *ICC*,
711 F.2d 295 (D.C. Cir. 1983)...........................................................44

*Louisiana Pub. Serv. Comm'n* v. *FERC*,
522 F.3d 378 (D.C. Cir. 2008)......................................................11, 35

*Mayo* v. *Reynolds*,
875 F.3d 11 (D.C. Cir. 2017)................................................................6

*Metropolitan Edison Co.* v. *People Against Nuclear Energy*,
460 U.S. 766 (1983)....................................................................19, 20

*Natural Res. Def. Council* v. *U.S. Nuclear Regul. Comm'n*,
879 F.3d 1202 (D.C. Cir. 2018)...........................................................33

*Nevada* v. *Dep't of Energy*,
457 F.3d 78 (D.C. Cir. 2006)...............................................................33

*Realty Income Trust* v. *Eckerd*,
564 F.2d 447 (D.C. Cir. 1977)..............................................................20

*Sierra Club* v. *FERC*,
38 F.4th 220 (D.C. Cir. 2022)..............................................................28

*Sierra Club* v. *FERC*,
867 F.3d 1357 (D.C. Cir. 2017).............................................................32

*Sugar Cane Growers Co-op. of Fla.* v. *Veneman*,
289 F.3d 89 (D.C. Cir. 2002)...............................................................38

*Viasat, Inc.* v. *FCC*,
47 F.4th 769 (D.C. Cir. 2022)..............................................................20

*Western Coal Traffic League* v. *STB*,
169 F.3d 775 (D.C. Cir. 1999).........................................................6, 37

**Statutes**

42 U.S.C. § 4332 ...................................................................19

42 U.S.C. § 4336a .................................................................21

49 U.S.C. § 11321 ................................................................34

49 U.S.C. § 11323 .............................................................1, 38

49 U.S.C. § 11324 ...............................................................1, 4

**Other Authorities**

Fed. R. App. P. 28 ..................................................................3

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| Board or STB | Surface Transportation Board |
| CPKC | Canadian Pacific Kansas City Limited |
| CP | Canadian Pacific Railway Limited |
| KCS | The Kansas City Southern Railway Company |
| Coalition | The Coalition to Stop CPKC |
| OEA | The Board's Office of Environmental Analysis |
| NEPA | National Environmental Policy Act |
| EIS | Environmental Impact Statement |
| ICCTA | ICC Termination Act of 1995, as amended |
| RVS | Reply Verified Statement |

**INTRODUCTION**

In September 2021, Canadian Pacific Railway Limited agreed to purchase Kansas City Southern in a transaction valued at $31 billion. The CP and KCS rail networks are a perfect fit. They cover disparate parts of Mexico, the United States, and Canada; come together only in Kansas City; and are "end-to-end" with no overlapping routes.

Before CP could take control of KCS, the Surface Transportation Board had to approve the transaction. *See* 49 U.S.C. § 11323(a). The railroads applied for such approval in October 2021. That kicked off a 17-month-long review process that generated hundreds of thousands of pages of administrative record; included a 15-month environmental review culminating in a 5,000-page Environmental Impact Statement; involved a week of public hearings and witness testimony; and drew hundreds of comments (almost all supportive) from shippers, other railroads, ports, local officials, federal legislators, labor groups, and more. In March 2023, the Board issued a 212-page decision approving the transaction as "consistent with the public interest." Op. 23; *see* 49 U.S.C. § 11324(c). The Board found that the merger will "enable the new CPKC system to better compete for traffic" against other large railroads, "foster the growth of rail traffic, shifting approximately 64,000

truckloads annually from North America's roads to rail," and "support investment in infrastructure, service quality, and safety." Op. 3. The Board also imposed a number of conditions aimed at protecting competition, labor, passenger-rail services, and the environment.

Out of the thousands of directly affected competitors, customers, employees, governmental bodies, and other stakeholders, only one challenges the Board's approval decision: the Coalition to Stop CPKC, a group of suburbs west of Chicago. In the main, the Coalition argues that the Board failed to reasonably or adequately analyze certain impacts of the CP-KCS merger on the Coalition communities, which straddle roughly 20 miles out of the 8,600 miles of CPKC's U.S. network. ID-51566 (Final EIS) at 2-3.[1] Respondents persuasively explains why all of the Coalition's contentions are meritless. CPKC respectfully submits this brief to supplement respondents' arguments and offer its own direct responses to the Coalition's misleading and often hard-to-follow presentation.

---

[1] All document identification numbers refer to the docket number from Board Docket No. FD 36500.

## STATEMENT OF THE ISSUES

1.      Whether the Board had substantial evidence for its conclusions regarding the merger's impact on Metra's commuter-rail service in the Coalition communities.

2.      Whether the Board complied with the National Environmental Policy Act.

3.      Whether the Board's decision to approve the merger complied with the Administrative Procedure Act and the ICC Termination Act.

4.      Whether this Court should remand without vacatur if it grants the petition for review.

## STATEMENT OF THE CASE

CPKC adopts and incorporates respondents' statement of the case.  *See* Fed. R. App. P. 28(i); Circuit Rule 28(d)(2).

## STATUTES AND REGULATIONS

CPKC agrees with respondents that no statutory or regulatory language is material here.

## SUMMARY OF ARGUMENT

I.      The Board had substantial evidence for its finding that the CP-KCS merger was unlikely to cause meaningful disruption to Metra's commuter-rail service in the Coalition communities.  The Board correctly

agreed with Applicants' projection that the merger would add eight new freight trains per day to the part of the Metra line that runs through the Coalition area (which is called the MD-W line), and the Board had many good reasons for concluding that the MD-W line can easily handle those additional trains. The Coalition's contrary arguments are forfeited, factually incorrect, premised on a misunderstanding, or some combination of the three. In all events, they cannot overcome the deference owed to the Board's assessment of railroad conditions in light of its technical expertise.

II. The Board fully complied with its obligations under NEPA. As an initial matter, it is not clear why the National *Environmental* Policy Act required the Board to analyze the sort of "impacts" raised by the Coalition, which do not implicate the physical environment: delays to vehicles at crossings where trains pass, delays to commuter trains, and passenger trains arriving at different station tracks. Regardless, the Board plainly considered each of those impacts in considerable detail, and its analysis was not just reasonable but airtight.

III. The Board's decision that the merger was in the public interest under the ICCTA did not violate that statute or the APA. Again, the Board had substantial evidence to conclude that the merger would not harm

passenger-rail service. But even if not, the Board's bottom-line conclusion was that the merger *as governed by the Board's conditions* was in the public interest. Those conditions include a dispute-resolution process between Metra and CPKC that kicks in if Metra's service is in fact degraded, as well as measures aimed at mitigating grade-crossing blockages. The Board's judgment was that such unlikely harms, if they did materialize, would be best addressed through mediation and mitigation rather than outright disapproval of a merger that promised significant public benefits. That determination is entitled to near-conclusive deference.

IV.    Finally, if the Court does find prejudicial error in the Board's decision, it should remand without vacatur. Unscrambling the nationwide merger of two major railroads two years after its consummation would be extraordinarily disruptive, and the Board has already signaled that it would prefer to address any transaction-related harms with mitigation, not outright disapproval of the merger. Over the past two years, the effects on Metra and the Coalition communities have been even less significant than the Board originally projected. There is no reason to upset the apple cart now.

## STANDARD OF REVIEW

A Board decision must be set aside "if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or if its findings of fact are unsupported by substantial evidence in the administrative record." *Western Coal Traffic League* v. *STB*, 169 F.3d 775, 778 (D.C. Cir. 1999). The Court will not upset the Board's decision so long as it is "supported by substantial evidence in the record and was reached by reasoned decision-making." *Grainbelt Corp.* v. *STB,* 109 F.3d 794, 798-99 (D.C. Cir. 1997).

The STB's "compliance with NEPA is reviewed under the" APA and its "deferential standard of review." *Mayo* v. *Reynolds*, 875 F.3d 11, 19 (D.C. Cir. 2017). The APA likewise governs review of the Board's determination whether the "merger to be approved is 'consistent with the public interest'" under the ICCTA. *Western Coal*, 169 F.3d at 778.

## ARGUMENT

The Coalition begins the argument section of its brief with NEPA. Before getting there, however, the Coalition takes aim at the Board's factual determinations regarding the impact of the CP-KCS merger[2] on Metra's

---

[2] Although the transaction at issue was not formally a corporate "merger" of CP and KCS, we, like the Board, refer to the transaction using that term for the sake of simplicity.

commuter-rail service in the Coalition communities. *See* Br. 7-8, 10-12. Those factual disputes are the basis for many of the Coalition's arguments under NEPA, the ICCTA, and the APA. This brief therefore begins with the Coalition's factual arguments about the merger's effect on Metra—arguments the Board easily and correctly rejected—before turning to NEPA, the ICCTA, and the APA.

## I. The Board Had Substantial Evidence For Its Conclusion That The Merger Was Unlikely To Cause Disruption To Metra's Commuter-Rail Service In The Coalition Communities.

The Coalition insists that the merger will harm Metra's passenger-rail service over the segment of the MD-W rail line that runs through the Coalition communities by increasing freight-train traffic there. According to the Coalition, freight-train interference will both increase delays to Metra trains and "increas[e] dangerous situations at Metra stations" by causing passengers to have to "cross active tracks on foot" to reach their train. Br. 44-45.

In its approval decision, the Board agreed with Applicants' projections and found that the merger would add just eight new freight trains per day— four in each direction—to the relevant MD-W segment. Op. 115. Those eight new trains would be in addition to a baseline of approximately 60 daily trains: 57 Metra commuter trains and 3 CP freight trains. *See* Coalition Br. 8; ID-

51566 (Final EIS) at 3.1-32, 3.1-35; ID-304552 (Amended Operating Plan) at 150. The Board then concluded that MD-W "has capacity for at least eight additional freight trains," such that "delays to Metra trains are unlikely to worsen" and that the merger is "not likely to cause disruption to Metra." Op. 115-117.

The Coalition takes issue with both steps in the Board's reasoning. It claims that eight new daily trains is a "significant[] underestimate." Br. 46. And it argues that, even if that projection is accurate, the merger will still cause significant issues with Metra's service. *Id.* The question here is whether the Board's contrary findings were "supported by substantial evidence in the record." *Grainbelt,* 109 F.3d at 799. They were.

## A. The Board Had Substantial Evidence For Its Conclusion That The Merger Would Add Only Eight Additional Trains To The MD-W Line.

The Coalition first contends (at 11) that the real number of additional freight trains that will traverse MD-W after the merger is "nearly 15" per day, not eight. That argument concerns the capacity of a different CPKC rail line, known as the Marquette Subdivision, shown below.



ID-304973 (Applicants Rebuttal Volume II) at 1220 (Walker RVS).[3]  According

to the Coalition, CPKC will have no choice but to frequently re-route six new

trains it plans for the Marquette Subdivision onto MD-W instead (hundreds of

miles out of the way), supposedly because the Marquette Subdivision lacks the

---

[3]  Pinpoint citations to ID-304973 are to the pagination of the public PDF file accessible on the Board's website.

capacity to add those trains. The Board thoroughly considered this argument and rejected it based on overwhelming evidence.

a. For starters, the Board imposed (with Applicants' assent) a binding, 20-year condition on the merger that specifically requires CPKC *not* to re-route trains "operating between Kansas City, Mo., and St. Paul, Minn." (connected via the Marquette Subdivision) "over MD-W" "except in emergency or other non-routine situations." Op. 111, 173. In other words, CPKC is forbidden from doing the very thing the Coalition says it will do.[4] That binding condition alone justifies the Board's conclusion that MD-W will see only eight additional freight trains as a result of the merger. Remarkably, the Coalition's brief says nothing about this. The Court could stop there.

b. At any rate, the Board had before it extensive evidence that the merger would not push the Marquette Subdivision over capacity. Applicants explained why the Subdivision would be "more than capable of handling" an increase of six daily trains once Applicants made planned infrastructure improvements, including new sidings (tracks specifically for passing) and

---

[4] The Board also imposed extensive data-reporting conditions that require CPKC to apprise the Board and the public of the number of trains operated on the Marquette Subdivision and MD-W for seven years. Op. 119-120, 142-143, 199.

signal system enhancements.  ID-304973 (Applicants Rebuttal Volume II) at 847-849 (Elphick RVS); *see id.* at 805 (Elphick/Orr RVS); ID-304552 (Amended Operating Plan) ¶¶ 289, 293-298.   Contrary to the Coalition's assertion (at 11), Applicants provided granular detail on both the timing of those capacity enhancements and the timing of the anticipated growth in train counts.  ID-304552 (Amended Operating Plan), App. R; ID-306259 (Oct. 6 Hearing Tr.) at 1651-55 (Elphick).  That analysis persuaded the Board, which agreed that the improvements would "ensure that capacity stay[ed] well ahead of traffic volume."  Op. 116 (internal quotation marks omitted).

That finding easily survives review for "substantial evidence," which "requires more than a scintilla, but can be satisfied by something less than a preponderance." *Louisiana Pub. Serv. Comm'n* v. *FERC*, 522 F.3d 378, 395 (D.C. Cir. 2008).  And even if it were a closer call, the Board was projecting the effect of traffic growth and infrastructure improvements on rail-line capacity. The Board's "predictive judgments about areas that are within [its] field of discretion and expertise are entitled to particularly deferential review." *BNSF Ry. Co.* v. *STB*, 526 F.3d 770, 781-782 (D.C. Cir. 2008).

c.     The Coalition occasionally suggests without explanation that the "analysis" of Marquette Subdivision capacity "conducted by Metra's experts"

undermines the Board's conclusion.  Br. 10-12; *see* Br. 7-8, 48.  As respondents explain (at 53), those bare references to Metra's filings are not enough to preserve any argument.  In any event, the underlying Metra claims were and are meritless.  For example, the Coalition asserts without citation that Applicants "could only avoid increased delays to Metra by accepting even greater delays to its own operations." Br. 48.  The Coalition could be referring to one piece of evidence that Metra put before the Board: a hypothetical railroad-operations model known as a "Rail Traffic Controller" or RTC model.

That model does not help the Coalition at all.  As the Board explained, neither its regulations nor its precedents require the use of RTC modeling to assess the capacity effects of a railroad merger, and the Board accepted Applicants' different modeling approach as persuasive.  *See* Op. 112-113 & n.172.  Nevertheless, for completeness, Applicants addressed Metra's RTC model and explained that it was chock-full of significant errors.  *See id.* at 112-113.  Applicants also submitted a corrected version of the model showing that the Marquette Subdivision in fact would have room for six more trains. *See* ID-304973 (Applicants Rebuttal Volume II) at 857-858 (Elphick RVS). That corrected model did not show that CPKC trains would experience more delays post-merger.  To the contrary, it showed that pre- and post-merger

performance would be "equivalent." *Id.* at 850. The Coalition appears to have been confused by the model showing slightly higher total delays *in the aggregate* for all CKPC trains, which was simply a mathematical artifact of adding six more trains to the line. Regardless, CPKC's trains carry freight, not commuters. It would be irrational for CPKC to respond to any additional minor delays on the Marquette Subdivision by re-routing trains 250 miles out of the way, at far greater expense and time, and in direct contravention of a Board-imposed condition. *Id.* at 849.

## B. The Evidence Showed That Delays To Metra Are Unlikely To Worsen From Eight Additional Freight Trains.

The Board next turned to the impact of the projected eight additional trains on Metra's service over MD-W. After examining the voluminous record, the Board gave four sound reasons why "delays to Metra trains are unlikely to worsen as a result of" that increase. Op. 115. The Board's determination is thus quadruply supported by substantial evidence.

First, the Board explained that MD-W "is double-tracked and contains infrastructure to accommodate additional trains, including several crossovers." Op. 115. Double-tracked means that trains moving in opposite directions can pass one another, while crossovers are switches that allow trains to move from one track to another, allowing faster trains to overtake slower

13

ones.  *See* ID-304973 (Applicants Rebuttal Volume II) at 832-834 (Elphick RVS); *id.* at 1209-1210 (Walker RVS).  Applicants showed that this high-speed, high-capacity segment of track has at least 30 available hour-long slots each day in which four eastbound and four westbound freight trains can be inserted without causing any interference to Metra.  *See* Resp. Br. 51-53.

The Coalition claims (at 12) that Applicants' analysis "exclude[d] Metra trains, existing and newly announced Amtrak trains, additional CP trains, local and other non-line-haul CP trains, and 'foreign' (non-CP) freight trains" in "assessing available capacity."  That is wrong.  Applicants' expert specifically charted slots for all 60 Metra trains and all 11 projected CPKC trains.  ID-304973 (Applicants Rebuttal Volume II) at 837 (Elphick RVS).  He also testified that he had "consider[ed] the impact of other types of trains" and had determined, based on CP's "understanding of local operations, yard and track maintenance activities, [and] foreign train activities," that they would not affect capacity.  *Id.* at 842.  Indeed, according to Metra itself, there are zero Amtrak trains on the relevant segment of MD-W, and the few non-CP freight trains that technically enter MD-W do so only briefly to cross into Bensenville Yard—a freight yard at the far eastern end of the Coalition area—

from another line.  *See* ID-304109 (Metra Comments Volume I) at 60; *id.* (Metra Comments Volume III Ex. C) at 24.

Second, the Board explained (at 115) that the new trains "will be able to run outside of Metra's peak operating windows," when it is particularly easy to find open slots.  *See* ID-304973 (Applicants Rebuttal Volume II) at 835-836 (Elphick RVS).  The Board noted that the trackage agreement between Metra and CP, now binding on CPKC, already requires CPKC to avoid interference with Metra's peak trains.  Op. 115.  CP did not historically schedule its trains during peak periods, and committed before the Board not to schedule its eight new trains then either.  *See* ID-304973 (Applicants Rebuttal Volume II) at 840-841 (Elphick RVS); *id.* at 1184 (Walker RVS).

Third, the Board noted that "Transaction-related traffic increases [were] expected to occur incrementally over a three-year period, allowing Applicants to adjust operations as needed" to avoid unexpected interference with Metra's service.  Op. 115.  In other words, it would take time for the newly consolidated CPKC to win the additional rail traffic it expects to attract.  *See* ID-306259 (Sept. 28 Hearing Tr.) at 126:1-12 (Creel).

Fourth and finally, the Board explained that Applicants' independent "reconfiguration" of Bensenville Yard will "ameliorate processing delays" in

and around that yard that have occasionally caused interference with Metra in the past. Op. 115-116. Those improvements will "substantially improve operations on the MD-W Line" by making it possible for freight trains to enter Bensenville Yard without blocking Metra's tracks, thus "reduc[ing] interference" at "the most critical location as it pertains to Metra's operations." ID-304973 (Applicants Rebuttal Volume II) at 843-845 (Elphick RVS), *id.* at 1211-1213 (Walker RVS); Op. 115. Thus, even assuming that additional freight trains would cause some additional delays to Metra, the Bensenville Yard improvements would counteract and perhaps even outweigh them.

## C. The Coalition's Focus On Pre-Transaction Delays Does Not Undermine The Board's Conclusion.

Unable to directly undercut the considerable evidence supporting the Board's findings, the Coalition relies almost entirely on an overly simplistic argument. It claims that, pre-merger, CP freight trains frequently caused delays to Metra's service, so there should be a "prima facie presumption that delays will increase" as freight-train counts increase. Br. 47. The Coalition invokes *Eagle County* v. *STB*, which held that the Board violated NEPA by determining, in an EIS, that an increase in rail traffic on an existing line would

"not be a qualitatively 'new ignition source'" of potential wildfires.  82 F.4th 1152, 1184 (D.C. Cir. 2023).

This case is nothing like *Eagle County*.  The Board here did not ignore additional freight trains as a potential "source" of harm to Metra's service.  To the contrary, the Board recognized the possibility that more trains meant more potential sources of delay, and then explained at length why that possibility was not likely to materialize.  Delay is not merely a function of numbers.  It depends on whether the additional trains can be slotted in, the impact of other developments (like infrastructure improvements), whether gradual growth will give CPKC time to make operational adjustments, and so on.  As discussed above, each of those factors pointed to the conclusion that "additional freight traffic on MD-W [will] not interfere with Metra's service." Op. 115-116.

Even taking the Coalition's argument on its own terms, it does not work for two reasons.  First, there is a significant mismatch between where on Metra's lines many pre-merger delays happened and where freight traffic will increase after the merger.  Most of the delays that Metra identified—at least two-thirds—occurred on different segments of Metra's track, not on the segment of MD-W west of Bensenville, where the Coalition communities are

located.  *See* ID-304973 (Applicants Rebuttal Volume II) at 1213-1215 (Walker RVS).

Second, the dire portrayal of pre-merger delays advanced by the Coalition is seriously overblown.  Even using Metra's overbroad definition of a CP-caused delay, Metra's own evidence showed that CP caused only one out of every 100 Metra trains to be late by more than six minutes (Metra's own delay threshold).  *See* ID-304973 (Applicants Rebuttal Volume II) at 1192, 1195-1196, 1200-1201 (Walker RVS).  Thus, even tripling the delays caused by CPKC would result in only a couple of additional Metra trains delayed out of every hundred.  Metra's on-time performance metrics would still be better, or at least no worse, than many other comparably sized passenger railroads (Metro-North, LIRR, New Jersey Transit, and SEPTA).  *See id.* at 1198.  The Board's conclusion that "the Transaction is not likely to cause disruption to Metra," Op. 117, would therefore remain accurate even accepting the Coalition's worst-case scenario.

## II.    The Board Fully Complied With NEPA.

The Coalition spends the bulk of its brief arguing that the Board failed to comply with NEPA.  In particular, the Coalition claims that the Board failed to "adequately consider" three different impacts on the Coalition communities

18

from the increased number of freight trains. Br. 44. First, it argues that increased traffic would "exacerbate the existing levels of road crossing blockages"—that is, delays that occur when cars must wait to allow a train to pass through road-level (or "at-grade") crossings. Br. 38. Second, increased freight traffic would purportedly "increas[e] delays" to Metra passenger trains. Br. 44. Third, the Coalition argues that increased freight traffic will "increas[e] dangerous situations at Metra stations," as Metra passengers would sometimes "cross active tracks on foot" to reach a commuter train that has arrived on the wrong track due to freight-train interference. *Id.*

Off the bat, it is not clear why any of these asserted impacts is the sort of "*environmental* effect" that must be considered under NEPA. 42 U.S.C. § 4332(C) (emphasis added). As the Supreme Court has explained, the term "environmental" in NEPA takes on its ordinary meaning, which is "the physical environment—the world around us, so to speak." *Metropolitan Edison Co.* v. *People Against Nuclear Energy*, 460 U.S. 766, 772 (1983). To "illustrate th[at] point," the Court pointed to statements from the legislative history referring to "the air, land, and water which support life on earth." *Id.* at 773 (quoting 115 Cong. Rec. 40416 (1969) (Sen. Jackson)). That definition makes sense, because NEPA "was intended to reduce or eliminate

environmental damage and to promote the understanding of [our] ecological systems and natural resources." *Department of Transp.* v. *Public Citizen*, 541 U.S. 752, 756 (2004). Those concerns do not map onto the Coalition's complaints. Being forced to wait longer for a train to pass or arrive is not an effect on any aspect of the natural world.

To be sure, this Court has "suggested that congestion such as vehicular and pedestrian traffic is an environmental harm against which NEPA is directed." *Viasat, Inc.* v. *FCC*, 47 F.4th 769, 780 (D.C. Cir. 2022) (internal quotation marks omitted). But the Court did so only in passing, in decades-old decisions that did not grapple with *Metropolitan Edison* or the plain language of NEPA. *See Realty Income Trust* v. *Eckerd*, 564 F.2d 447, 452 n.10 (D.C. Cir. 1977); *Glass Packaging Institute* v. *Regan*, 737 F.2d 1083, 1092 (D.C. Cir. 1984). Those cases invoked *Hanly* v. *Mitchell*, a 1972 decision in which the Second Circuit stated—also without explanation—that NEPA "must be construed to include" effects on the "urban environment." 460 F.2d 640, 647 (2d Cir. 1972). It is not clear that *Hanly* and its approach survive *Metropolitan Edison* and the Supreme Court's intervening statutory-interpretation decisions. This Court does not need to decide that here, however, because even if NEPA required the Board to evaluate the merger's

effects on grade-crossing delays, passenger rail, and conditions at Metra stations, the Board amply satisfied that obligation.

### A. The Board Sufficiently Considered Road Crossing Delays In The Coalition Communities.

The Coalition focuses almost all of its energy on the impact of the merger on delays to motorists that occur when a freight train passes through at-grade crossings. *See* Br. 13-27, 37-44. The Board addressed this potential impact in detail. It spent over two single-spaced pages of its final approval decision analyzing commenters' "concerns about grade crossing delay and emergency response due to blocked crossings." Op. 163-165. The Board also incorporated the discussion of the issue in the Final EIS prepared by its Office of Environmental Analysis. *Id.* at 171. That document included dozens of pages of analysis and hundreds of pages of tables and maps assessing the crossing-delay issue. ID-51566 (Final EIS) at 3.3-1 to 3.3-32, App. H at H-1 to H-468, App. S at S-140 to S-240. Indeed, depending on how one counts appendices, OEA spent as many pages evaluating grade-crossing delays *alone* as federal agencies are now permitted to spend on an *entire EIS*, under an amendment to NEPA enacted after the Board's decision. *See* 42 U.S.C. § 4336a(e)(1) (limiting an EIS to 150 pages in the usual case and 300 pages for actions of "extraordinary complexity").

Relying on OEA's detailed analysis, the Board found that the merger would cause, at most, "only minor adverse impacts on grade crossing delay." Op. 163. It therefore declined to impose the Coalition's requested mitigation conditions, *id.* at 165, 168-169, which would have required the construction of separated crossings (*i.e.*, overpasses or tunnels) in a number of locations at the cost of at least $5 billion to Applicants, ID-304973 (Applicants Rebuttal Volume I) at 299. The Board did, however, require CPKC to (i) generally prevent its trains from blocking public at-grade crossings for longer than ten minutes; (ii) install and fund systems that deliver advanced warning of blocked crossings; and (iii) appoint a Chicago-area community liaison. Op. 112, 165-166, 174, 201-202, 210-212.

Despite all of this, the Coalition offers three reasons why the Board did not "adequately consider" grade-crossing delays. First, the Coalition claims that the Board did not take a "hard look" at crossing delays *specifically* in the Coalition communities, which have 30 at-grade MD-W crossings among them. Br. 38. Second, without acknowledging the tension, the Coalition attempts to poke holes in the Board's Coalition-specific analysis. Br. 24-26. Third, the Coalition asserts several procedural defects in OEA's analysis. All of those arguments are meritless.

1.     First, the Coalition's insistence (at 32) that the Board failed adequately to analyze the grade-crossing issue "using baseline data specific to the Coalition line" is simply untrue.   Both the Draft EIS and Final EIS thoroughly analyzed grade-crossing delays in the Coalition area using information specific to each affected crossing.

OEA began by providing basic crossing delay-related information for all 1,365 crossings nationwide affected by the merger.   For each crossing (including the 30 in the Coalition area), that information included (i) the average daily number of motor vehicles; (ii) the total number of trains per day both with and without the merger in the year 2027; (iii) the average speed of those trains; (iv) the length of the average train both with and without the merger; and (v) the resulting average "gate down time" caused by a train passing through the crossing in both the merger and non-merger alternatives. ID-51566 (Final EIS) App. H at H-3.

"Consistent with past practice," OEA then quantified delay impacts in more detail "for grade crossings on public roadways with" average daily traffic above 2,500 vehicles per day, which included 20 Coalition crossings.  ID-51566

(Final EIS) at 3.3-2.[5]  OEA deployed its standard "Level of Service" (LOS) formula to project traffic flow as of 2027 at those crossings.  *See* Resp. Br. 10-13, 21-24.  The results showed that every Coalition crossing would remain at LOS A after the merger, the highest level that "represents free flow conditions" for traffic.  Op. 164 n.243.  OEA also used a related formula to generate the "maximum vehicle queue" at each crossing—that is, the greatest number of vehicles that could be stuck waiting during rush hour.  ID-51566 (Final EIS) App. H at H-332 to H-334.  That number, too, increased just barely—by one or two vehicles at each crossing—in the merger alternative.  *See, e.g.*, *id.* App. H at H-450 (queue at Bartlett crossings increased from 4 to 5, 5 to 6, 11 to 12, and 16 to 18).

After issuing the Draft EIS, OEA conducted a site visit to the Coalition communities and held a public meeting at which representatives and citizens offered testimony.  ID-51566 (Final EIS) App. S at S-6; Op. 152-153.  OEA later provided over 50 pages of detailed responses to the comments it received—both during and outside that meeting—on grade-crossing delays *just at the 30 Coalition crossings*.  *See* ID-51566 (Final EIS) App. S at S-140

---

[5]  The Coalition does not challenge OEA's use of that typical cutoff for more detailed analysis of crossing-delay impacts.

to S-149, S-152 to S-168, S-172 to S-174, S-178 to S-179, S-194 to S-195, S-198 to S-199, S-201 to S-225, S-230 to S-232.

OEA also performed two entirely new analyses in response to the Coalition's concerns. *See* Op. 156. For all 30 Coalition crossings, OEA broke out its estimates of how long gates would be down for each different type of train that would pass through—shorter freights, longer freights, and commuter trains. *See* ID-51566 (Final EIS) App. H at H-335 to H-336; *id.* at H-346 to H-355. OEA also recognized that, "although an infrequent occurrence, a grade crossing can become blocked when a train comes to a stop before clearing the crossing," which could lead to the "rare" but "potentially serious situation" of a blocked first responder. *Id.* App. H at H-336, App. S at S-141 to S-142. To address that possibility, OEA estimated the additional mileage and time that it would take to travel via an unblocked crossing. *Id.* App. H at H-336. OEA took this step for 761 crossings, including 20 of the 30 Coalition crossings, and provided detailed maps for all 761. *Id.* App. H Att. 1. Based on that assessment, OEA found that for almost all of the 20 Coalition crossings, an alternate crossing would be available within five miles; the longest distance (for two crossings) was 7.5 miles. *Id.* at H-347 to H-355.

2.     Tacitly admitting that OEA did consider grade-crossing delays in its communities, the Coalition turns to nitpicking certain aspects of that analysis.  Under NEPA, however, this Court's role "is not to flyspeck" or look "for any deficiency no matter how minor, but instead simply to ensure" that the agency has "examin[ed] the relevant data." *El Puente* v. *U.S. Army Corps of Eng'rs*, 100 F.4th 236, 246 (D.C. Cir. 2024); *see* Resp. Br. 19-20, 43-44.

a.     The Coalition argues (at 31-32) that OEA's LOS formula was "structurally biased" because OEA used train lengths that were "unrealistically short," thus systematically underestimating the amount of time it would take for a train to pass through a crossing.  The Coalition points to OEA's use of a single "weighted average" train length that blended both passenger and freight trains together.  Br. 16-17; *see* Br. 24-25, 39 n.9.  The weighted average OEA used was 1,418 feet for the nonmerger alternative and 1,960 feet for the merger alternative.  The Coalition complains that both those figures are a "fraction[] of the length of freight trains that actually traverse[] the Coalition line, some of which [are] 10,000 to 12,000 feet long." *Id.* at 17.

That argument is hard to understand.  The Coalition recognizes (at 17) that OEA calculated its weighted averages by using a much shorter length for passenger trains (988 feet) than for freight trains (6,817 feet post-merger).

The Coalition does not dispute the accuracy of those figures, so it is not clear what the Coalition is complaining about. The post-merger weighted average of 1,960 feet is much less than 6,817 because there are far more passenger trains than freight trains on MD-W, pulling down the average. But the post-merger weighted average is still 40% greater than the nonmerger average (1,960 to 1,418), because it captures the additional feet of freight train passing through—and additional associated gate down time for—each crossing after the merger.

Regardless, even if OEA was required to separately estimate delays for each different type of train, it did just that at each Coalition crossing. OEA created Table H.2-2, which provided separate calculations of gate down time for passenger trains, "bulk freight" trains of 7,600 feet, and longer freight trains of 10,000 feet. *See* ID-51566 (Final EIS) App. H at H-335 to H-336, H-346 to H-355. The Coalition contends (at 25) that it is "not clear" how these "estimated [crossing] gate down times" "relate to the previous calculations" using the weighted-average train length. But it is clear. OEA used the same formula: train length divided by speed, plus ".6 minutes for gate closing and opening." *Id.* at H-332. Thus, a 7,600-foot freight train moving at 40 mph (3,520 feet per minute) would cause a gate down time of 2.8 minutes, a 10,000-

foot train moving at 25 mph (2,200 feet per minute) would cause a 5.1 minute delay, and so on. *See, e.g.*, *id.* at H-347 (showing these values).

To the extent the Coalition takes issue with the Board's use of a weighted average in general, that argument fails. Under NEPA, this Court's task is to ensure that "the methodology used . . . is either consistent with past practice or adequately justified." *Sierra Club* v. *FERC*, 38 F.4th 220, 228 (D.C. Cir. 2022). OEA's methodology checks *both* of those boxes. As OEA explained, its use of the "industry standard" LOS and maximum-queue formulas to "quantif[y] delay impacts for grade crossings" was "consistent with [OEA's] past practice." ID-51566 (Final EIS) at 3.3-2, App. S at S-23, S-156. And using that mathematical, average-based model "[f]or simplification purposes" was plainly warranted by the sheer number of affected crossings. *Id.* App. H at H-332; *see* Resp. Br. 24-26.[6]

b.     Turning to speed, the Coalition argues that both the Draft EIS and Final EIS assumed that freight trains would move unrealistically quickly

_____

[6] Although the Coalition contends (at 16) that OEA's calculations treated "evening rush hour" traffic the same as traffic at "2:00 AM," that is exactly what the maximum-vehicle-queue formula is designed to avoid. That formula reflects "peak-hour traffic" dynamics by applying an adjustment to the average daily vehicle count to approximate rush-hour congestion. *See* ID-51566 (Final EIS) App. H at H-334, App. S at S-156.

over MD-W. Br. 15-16, 17, 24-25, 38. As with train lengths, OEA explained that it relied on timetable "data provided by CP." *See* ID-51566 (Final EIS) App. H at H-3. Drawing from that data, the Draft EIS generally made its calculations by assuming that freight trains would move at their maximum authorized speed of 40 mph. *Id.*; ID-51355 (Draft EIS) App. H at H1-16 to H1-17 (OEA used 35 mph at several crossings). In the Final EIS, OEA then decreased the speed at certain crossings to 25 or 35 mph in response to specific comments. *See* ID-51566 (Final EIS) App. H at H-16 to H-18, App. S at S-23 to S-24.

Here again, OEA's approach was eminently reasonable. The evidence before the Board supported the conclusion that maximum freight speed was a reasonable proxy for real-world conditions. One of Applicants' experts testified that freight trains and passenger trains (subject to higher maximum speed limits) typically run MD-W at the same rate as one another (including stops for passengers by Metra trains). *See* ID-304973 (Applicants Rebuttal Volume II) at 835 (Elphick RVS).

Regardless, even if OEA's speed assumptions did not perfectly track the real world, that would not undercut its analysis. Again, because "conducting site-specific traffic studies" at all 1,365 affected crossings "would have been

impractical," ID-51566 (Final EIS) App. S at S-24, OEA chose to rely on the speed-limit data at hand, which it adjusted downward at certain crossings based on comments it received. OEA then used those speeds to calculate delay the same way for the merger and nonmerger alternatives. Because any real-world inaccuracy in the assumed speed was reflected in both, OEA could make an apples-to-apples comparison and "quantify [the] changes in delay[s]" attributable to the merger—which was, after all, the point of the exercise. *Id.* at 3.3-2.

c.     The Coalition also contends that the gate down time analysis in both the Draft and Final EIS was "unrealistic[]" because it assumed that trains would never stop and block the crossing. Br. 26, 38. But the Final EIS took account of that exact possibility. As discussed above, OEA reviewed local maps to estimate the potential re-routing delays that would occur in those rare cases when a crossing was blocked by a stopped train, and found that they were generally minor. *See supra*, p. 25.

3.     Finally, the Coalition asserts that the Board's NEPA analysis of crossing delays was procedurally flawed in two further ways. These arguments too are unpersuasive.

First, the Coalition claims (at 19-20 and 41) that the Board erred by not adopting the conclusions of a field study prepared by one of the Coalition's member towns. For one thing, that study came too late. The Coalition submitted it only "after OEA had issued the Draft EIS," even though OEA had sent the Coalition members a Notice of Intent asking for "local governments, agencies, and officials" to provide information during the initial scoping process. ID-51566 (Final EIS) App. S at S-25. Regardless, as respondents explain (at 38-40), both OEA and the Board itself concluded that the study was grievously flawed and reasonably declined to follow it.

Second, the Coalition argues (at 41-44) that OEA's analysis of crossing delays was less searching than its prior NEPA analysis of the same issue for a purportedly analogous merger. Respondents' brief explains (at 42-43) why that prior transaction was not remotely analogous. In any event, the Coalition cites no authority for the proposition that NEPA is some sort of one-way procedural ratchet. As always, the agency's "choice among reasonable analytical methodologies is entitled to deference." *Sierra Club* v. *FERC*, 867 F.3d 1357, 1368 (D.C. Cir. 2017).

## B. The Board Sufficiently Considered Passenger Rail Delays.

Shifting to a different possible effect of the merger, the Coalition argues (at 45) that the "Final EIS did not contain *any* analysis" of the "adverse impacts on passengers by increasing delays" to Metra trains. That is incorrect. OEA responded to comments discussing the "impact on commuters and Metra commuter rail operations" by explaining that any delays would be the result of CPKC's "dispatching of passenger and freight trains on shared track," which "would not be an environmental impact . . . and [was] thus outside of OEA's environmental review." ID-51566 (Final EIS) App. S at S-44 to S-46. As a result, OEA explained that "the Board [would] address issues related to rail line capacity and dispatching as part of its review of the transportation merits" "in its final decision." *Id.* The Board later did that in great detail, as discussed above. Nevertheless, the Final EIS too discussed a number of reasons why the merger was not likely to harm Metra, previewing what the Board would eventually say in reaching that same conclusion. *See id.* App. S at S-46, S-126.

Regardless, the Board's own detailed analysis of the impact of the merger on Metra's service satisfied NEPA in and of itself. When an agency "render[s] a comprehensive opinion" that "include[s] considerable discussion

of environmental impacts," it does not matter that the agency did not place that discussion under the technically "correct[] label" of an EIS. *Friends of the River* v. *FERC*, 720 F.2d 93, 106-107 (D.C. Cir. 1983); *see, e.g.*, *Natural Res. Def. Council* v. *U.S. Nuclear Regul. Comm'n*, 879 F.3d 1202, 1210-1211 (D.C. Cir. 2018); *Nevada* v. *Dep't of Energy*, 457 F.3d 78, 90-91 (D.C. Cir. 2006). An EIS "is not an end in itself, but rather a means" to ensure that the agency sufficiently considered environmental impacts, *Friends of the River*, 720 F.3d at 106, and "that the public had sufficient information to comment" on them, *Nevada*, 457 F.3d at 90.

### C. The Board Sufficiently Considered Track-Crossing Issues At Metra Stations.

Finally, the Coalition contends (at 44-45) that the Board violated NEPA because it "did not consider the safety issues" at Metra stations that would be caused by increased freight-train traffic leading to more so-called "alternate-track" events—when the presence of a freight train causes a Metra train to arrive on a different-than-customary track. Again, the Final EIS did address that issue in detail, and gave a number of reasons why the merger would not result in any significant impacts to passenger safety. ID-51566 (Final EIS) App. S at S-108 to S-109; *see* Resp. Br. 45-49. As discussed, the Board also observed that the additional freight trains would be scheduled outside of the

peak rush hour periods when most of Metra's MD-W trains operate. *See supra*, p. 15.

## III. The Board's Decision Did Not Violate The APA Or ICCTA.

The Coalition also argues that the Board's approval of the merger violated both the APA and the ICCTA, which governs the Board's assessment of proposed railroad mergers. The ICCTA required the Board to approve the merger if it was "consistent with the public interest." 49 U.S.C. § 11324(c). In making that determination, the Board had to "balance[] the benefits of the merger against" an array of potential harms, Op. 18, including the possibility of "passenger-rail disruption," *id.* at 108 n.166. As discussed above, the Board here concluded that the merger was "not likely to cause disruption to Metra" or "harm Metra's commuter rail service," *id.* at 116-117, and agreed with OEA that the "potential impacts . . . on grade crossing delay and emergency vehicles" would be "negligible, minor, and/or temporary," *id.* at 157; *see id.* at 163-165.

On the other side of the ledger, the Board concluded that the merger would generate substantial public benefits. Op. 23-31. It explained that the merger would create new single-line services connecting Mexico, the United States, and Canada, thereby expanding market access for shippers,

eliminating costs through efficiencies, and strengthening North American supply chains. It would also reduce carbon emissions, *id.* at 25, provide a safer mode of crude-oil transportation, *id.* at 27, enhance competition with other large freight railroads, *id.* at 26, and bring about more than $275 million in infrastructure investment, *id.* at 30. The Coalition does not challenge any of those points.

Instead, the Coalition's APA and ICCTA arguments boil down to the claim that the Board lacked substantial evidence for its assessment of the harms the merger might cause "to the Chicago area." Br. 48. As set forth above, however, the Board had far "more than a scintilla" of evidence for its determination that those harms would be minor. *Louisiana Pub. Serv. Comm'n*, 522 F.3d at 395. For that reason alone, this Court should reject the Coalition's arguments.

The Coalition's claims regarding the impact of the merger fail for another, independent reason. Although the Board determined that the merger would not significantly harm the Chicago area, its bottom-line conclusion was that the merger "*as conditioned*" by the Board would "not adversely affect the adequacy of transportation to the public." Op. 172 (emphasis added). The Board's conditions addressed the possibility of harm

to Metra's service by requiring CPKC to (i) file regular reports on delays and (ii) engage in a robust dispute-resolution process with Metra, escalating to mandatory mediation, if delays cross a certain threshold. The Board also reserved ongoing power to act to address delays if circumstances warranted. *See id*. at 117-120. The Board's conditions adopted Metra's own publicly stated goal of 95% on-time performance as a proxy for harm to Metra. *See* ID-304973 (Applicants Rebuttal Volume II) at 1195, 1197-1198 (Walker RVS). The mandatory dispute-resolution process kicks in if "more than 5% of Metra's scheduled trains . . . arriv[e] at their destinations at least six minutes behind schedule due to CP freight train interference." Op. 118.

The Board thus concluded that even if the merger did end up causing "unforeseen harm" in the form of substantial delays to Metra trains, Op. 118, the public interest would be best served not by blocking the merger altogether, but by having CPKC and Metra attempt to resolve the issue themselves, with Board intervention as an available backstop. As the Board explained, "[c]oncerns about service disruptions that could arise if CPKC's capacity [was] not adequate to handle anticipated traffic increases" were "best addressed through oversight monitoring and supplemental orders, if warranted." *Id*. at 23; *see id*. at 5 (noting that the Board "will be able to issue additional orders

later, if necessary," "to prevent[] potential merger-caused delays and service disruptions of commuter service in the Chicago area"). Conditioned in that way, the Board determined that the merger was in the public interest. *Id.* at 31, 172. That determination "is entitled to considerable deference." *Western Coal*, 169 F.3d at 778.

## IV. At Most, Remand Without Vacatur Would Be The Appropriate Remedy Here.

Even if the Board erred in some way, the Court should remand the Board's decision without vacating it. That remedy is appropriate where either (i) vacatur would result in "disruptive consequences" or (ii) there is a "substantial likelihood that the agency, after further consideration, will be able to remedy its error and reach a similar overall result." *Heartland Reg'l Med. Ctr.* v. *Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009); *see American Bankers Ass'n* v. *National Credit Union Administration*, 934 F.3d 649, 674 (D.C. Cir. 2019) (a "strong showing of one factor" suffices).

Both factors are present in this case. The Coalition asks this Court to unwind a major railroad combination creating a combined network spanning the United States, Canada, and Mexico and generating extraordinary public benefits. Because the Coalition did not obtain (or even seek) a stay of the Board's approval, the merger has been fully consummated for more than 22

months as of the date of this brief, with yet more months to pass before the Court issues a decision. Yet the Coalition seeks vacatur based on arguments that, even if accepted, almost certainly would not change the Board's decision. This is the paradigmatic circumstance for remand without vacatur.

## A. Vacatur Would Cause Extraordinary Disruption.

This Court has repeatedly held that a "quintessential disruptive consequence arises when an agency cannot easily unravel a past transaction in order to impose a new outcome." *American Great Lakes Ports Ass'n* v. *Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020); *see Sugar Cane Growers Co-op. of Fla.* v. *Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002). That is the situation here. Common control of CP and KCS would become immediately unlawful upon vacatur of the Board's approval decision. *See* 49 U.S.C. § 11323(a) (control of one carrier by another "may be carried out only with the approval and authorization of the Board"). Vacatur would thus upend what is now a long-settled, major commercial transaction; strand hundreds of millions of dollars of investment that Applicants made in reliance on the merger's approval; and call into question all or many contracts between CPKC and third parties.

The Board's approval decision approving the CP-KCS merger became effective on April 14, 2023, and the two companies quickly combined under

common control and began integrating. Within a month, CP and KCS had combined their respective boards and executive management teams.[7] The newly created CPKC then began integrating its operational and rail networks. That required it to make large investments in capital improvements, negotiate new agreements with labor unions, integrate IT systems, and roll out new freight services for its combined rail network.[8] All of that effort and investment would be stranded by undoing the Board's approval decision, and significant costs would be incurred to separate KCS from CPKC.

Vacatur would also have a significant impact on parties not before this Court. For two years, CPKC has approached the market as a single

---

[7] CPKC Press Release Apr. 14, 2023 (announcing combination), https://tinyurl.com/54kfbp3t; CPKC Press Release April 14, 2023 (announcing new Board appointments), https://tinyurl.com/2s3h8zmw; CPKC Press Release March 17, 2023 (announcing new integrated management team), https://tinyurl.com/32dbvdcx; *see generally* CPKC 2023 Annual Report, https://tinyurl.com/mr3kjwnr. CPKC presents these and other extra-record materials, the accuracy of which cannot reasonably be questioned, solely to inform any remedial analysis the Court may find necessary.

[8] *See* CP/KCS Oversight, Finance Docket No. 36500, CPKC 6th Quarterly Environmental Mitigation Report (filed Oct. 14, 2024), EI-33639 (describing CPKC's capital improvement projects undertaken pursuant to the merger); CPKC Press Release May 11, 2023 (announcing new MMX intermodal service between Mexico and Chicago), https://tinyurl.com/y3xn6wmw; CPKC Press Release May 30, 2023 (regarding investment in refrigerated containers), https://tinyurl.com/3864yjp4.

commercial unit, making offers to and entering contracts with customers, suppliers, and strategic partners.[9]  By offering its newly unified network, CPKC has been able to attract freight from other railroads and the highways and is likely to continue to do so.[10]  All of the transportation services now using this combined CPKC network, however, are contingent on CP and KCS's being under common control.  As a result, vacatur would call into question, if not outright invalidate, all of CPKC's new cross-network transportation contracts with third parties.  The uncertainty alone would lead to commercial disruption, chaos in the freight market, and harm to the national economy.

This Court has opted to remand without vacatur in cases that involved similarly widespread disruption.  *See, e.g.*, *American Bankers Ass'n*, 934 F.3d at 674 (vacatur "could make it more difficult for some poor and minority suburban residents to receive adequate financial services"); *American Great*

---

[9]  *See* CPKC Press Release April 21, 2023 (announcing multi-year deal with Schneider), https://tinyurl.com/5d7up8j6; CPKC Press Release June 21, 2023 (announcing strategic collaboration with Americold to develop refrigerated warehouses), https://tinyurl.com/y4b3wp2m; Ballard Press Release December 5, 2024 (announcing new long-term supply agreement with CPKC for supply of fuel cell engines), https://tinyurl.com/yyap4jez.

[10]  *See* CP/KCS Oversight, Finance Docket No. 36500 (Sub-No. 6), CPKC'S January 2025 Traffic Diversion Submission (filed Jan. 15, 2025), ID-309108.

*Lakes*, 962 F.3d at 519 (vacatur might cause parties to try "to recoup and redistribute funds that changed hands years ago").

This Court has also declined to vacate where it was clear that "leaving the current [order] in place" pending remand would "do no affirmative harm." *Advocates for Highway & Auto Safety* v. *Federal Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005). Here, leaving the Board's approval in place for a time would do no harm to the Coalition. Since the merger closed, the Coalition has not raised a single complaint to the Board regarding freight-train volumes in the Chicago area. Nor has Metra. Nor has either party sought to invoke any dispute-resolution or consultation mechanisms, nor asked the Board to issue supplemental orders.

That is likely because, exactly as the Board predicted, CPKC has added new traffic to the Chicago area gradually, and the new trains have not caused the impacts feared by the Coalition. CPKC's public filings show that, since the merger, the number of daily CPKC freight trains on MD-W west of Bensenville Yard averages just 4.57, far from the 11 total per day that the Board and CPKC projected post-merger.[11] And as Applicants predicted, the

---

[11] This figure reflects the average train counts for the one-year period between January 27, 2024 and January 31, 2025. *See* Finance Docket No.

average length of the CPKC freight trains passing through the Coalition communities has gone down, not up.[12]  CPKC's filings also show that the merger did not cause disruption to Metra's operations.  Since the merger, the average number of Metra trains delayed due to CPKC freight train interference has *decreased* from one out of every 100 trains, *see supra*, p. 17, to just one out of every 300 trains.[13]

> **B.**    **The Board Is Likely To Reach The Same Decision On Remand.**

On remand, the Board very likely would be able to correct any errors this Court identifies while reaching the same result.  It likely would reaffirm its conclusions about harms to Coalition communities.  After all, evidence of the merger's actual real-world impact over the last two years would be fair game, and that evidence strongly supports the Board's original findings.  The Board surely would note that Metra itself no longer challenges the merger.

---

36500 (Sub-No. 6), Monthly CPKC Data Submissions, Operational Data Files (reporting train counts on MD-W at Primary Keys 119 and 120).

[12] *See id.* (reporting median train length on MD-W at Primary Key 122). Average median train length for the five years prior to the effective date of the Board's decision was 6,357 feet.  The average between January 27, 2024 and January 31, 2025 was 5,809 feet.

[13] The figure in text reflects the average for MD-W between May 2024 and January 2025.  *See* Finance Docket No. 36500 (Sub-No. 6), Monthly CPKC Data Submissions (reporting percentage of Metra trains late due to CPKC freight train interference).

Even if the Board somehow changed its mind about the likelihood of harms to the Coalition, that likely would not change the Board's ultimate decision to approve the merger with oversight conditions, rather than outright reject it. The Coalition's proposed environmental mitigation would have been incredibly costly, requiring CPKC to spend between $5.5 to $9.5 billion. ID-304973 (Applicants Rebuttal Volume I) at 299. That is more than has been spent in the aggregate on 70 different improvement projects across the entire Chicago rail network since 2003. *Id.* Even assuming that a revised NEPA analysis projected significantly more delay at Coalition crossings, it is very unlikely the Board would require CPKC to spend anything like $5 billion on mitigation. As OEA explained, "[a]ny mitigation measures the Board imposes" under NEPA must "be reasonable." ID-51566 (Final EIS) at 4-1.

The same is true of the alleged harms to Metra upon which the Coalition seeks to piggyback. As explained earlier, the Board has already designed a detailed and robust remedial framework to govern in the "unlikely" event that its predictions about merger-induced harm to Metra's passenger service end up being incorrect. Op. 117; *see supra*, Sections I, III. Even if the Board came to consider those harms more likely, it presumably would opt for the same kind of remedial approach.

At bottom, there is no good reason to disrupt CPKC's operations and the larger freight economy based on the Coalition's arguments. This Court has already remanded without vacatur in a similar case. In *Lamoille Valley Railroad Company* v. *ICC*, 711 F.2d 295, 313 (D.C. Cir. 1983), the Court reviewed the ICC's decision to approve the merger of two railroads without imposing any conditions designed to protect competition. After the Court affirmed the ICC's public-interest determination, it remanded for the Commission to reconsider whether to impose certain "protective conditions" urged by two competitors, but left the merger in place pending that remand. *Id.* at 300. The same approach would be warranted here.

## CONCLUSION

For the foregoing reasons, the petition for review filed by the Coalition should be denied. If the Court grants the petition, it should remand without vacatur.

FEBRUARY 21, 2025                    Respectfully submitted,

/s/ *David L. Meyer*

C. ANDREW GERLACH                    DAVID L. MEYER
MAXWELL F. GOTTSCHALL                LAW OFFICE OF DAVID L. MEYER
SULLIVAN & CROMWELL LLP              1105 S Street NW
125 Broad Street                     Washington, DC 20009
New York, NY 10004                   (202) 294-1399
(212) 558-4789                       david@meyerlawdc.com

ADAM S. PARIS                        JEFFREY B. WALL
SULLIVAN & CROMWELL LLP              SULLIVAN & CROMWELL LLP
1888 Century Park East               1700 New York Avenue NW
Los Angeles, CA 90067                Washington, DC 20006
(310) 712-6663                       (202) 956-7500
                                     wallj@sullcrom.com

# CERTIFICATE OF COMPLIANCE

This brief complies with this Court's Rule 32(e)(2)(B), along with the Court's September 30, 2024 Order, because it contains 9,080 words.

This brief also complies with the requirements of Federal Rule of Appellate Procedure 27(d)(1)(E), 32(a)(5) and (6) because it was prepared in 14-point font using a proportionally spaced typeface.

/s/ David L. Meyer
David L. Meyer

*Counsel for Respondent-Intervenor Canadian Pacific Kansas City Limited*

FEBRUARY 21, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 21st day of February, 2025, I electronically filed the foregoing brief with the Clerk for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. I certify that service will be accomplished by the CM/ECF system for all participants in this case who are registered CM/ECF users.

*/s/ David L. Meyer*
David L. Meyer

*Counsel for Respondent-Intervenor Canadian Pacific Kansas City Limited*

FEBRUARY 21, 2025