# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 23-1165                          September Term, 2024

FILED ON: JUNE 20, 2025

COALITION TO STOP CPKC,
        PETITIONER

v.

SURFACE TRANSPORTATION BOARD AND UNITED STATES OF AMERICA,
        RESPONDENTS

CANADIAN PACIFIC KANSAS CITY LIMITED,
        INTERVENOR

On Petition for Review of an Order
of the Surface Transportation Board

Before: HENDERSON, RAO, and GARCIA, *Circuit Judges*

### J U D G M E N T

This appeal was considered after oral argument on the briefs and the district court record. The Court has afforded the issues full consideration and determined that they do not warrant a published opinion. *See* D.C. Cir. R. 36(d). For the reasons stated below, it is

**ORDERED** and **ADJUDGED** that the petition for review be **DENIED**.

\* \* \*

The Surface Transportation Board approved the merger of two of the largest North American railroad companies, Canadian Pacific and Kansas City Southern. A coalition of suburban Chicago communities petitions our court for review of the Board's merger-approval order. The coalition contends that the Board failed to adequately consider environmental harms under the National Environmental Policy Act and arbitrarily weighed the merger's costs against its benefits. Because the Board thoroughly considered the merger's potential environmental harms and reasonably concluded the merger was in the public interest, we deny the petition for review.

**I**

The Interstate Commerce Act—as modified by the ICC Termination Act of 1995 (ICCTA)—charges the Surface Transportation Board with reviewing and approving proposed railway mergers. *See* 49 U.S.C. § 11323(a)(1); *see also Norfolk S. Ry. Co. v. Surface Transp. Bd.*, 72 F.4th 297, 300 & n.1 (D.C. Cir. 2023). The Act provides that the Board "shall approve" a merger if "it finds the transaction is consistent with the public interest." 49 U.S.C. § 11324(c); *see also id.* § 11323(a).[1] Pursuant to the National Environmental Policy Act (NEPA), the Board must also prepare an Environmental Impact Statement (EIS) if it determines that a merger may "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 653 (D.C. Cir. 2011).

In October 2021, Canadian Pacific and Kansas City Southern applied to the Board for approval to merge into the Canadian Pacific Kansas City (CPKC) railway. Once combined, the companies' rail lines would span more than 20,000 miles across Canada, the United States, and Mexico. After preparing an EIS and conducting the public-interest analysis required by the ICCTA, the Board determined that the merger's potential harms were minimal and were outweighed by its potential public benefits. The Board thus approved the merger in March 2023, subject to various conditions.

Three entities petitioned for review of the Board's approval order. Two of those petitions have since been voluntarily dismissed. Only the petition of the Coalition to Stop CPKC—an organization representing a collection of Chicago suburbs located near one 23-mile segment of Canadian Pacific's rail line—remains pending before our court.

**II**

We review the Board's order "under the Administrative Procedure Act, examining whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Snohomish Cnty. v. Surface Transp. Bd.*, 954 F.3d 290, 301 (D.C. Cir. 2020) (cleaned up). Similarly, "when determining whether an agency's EIS complied with NEPA, [we] afford substantial deference to the agency" and will "not micromanage th[e] agency['s] choices so long as they fall within a broad zone of reasonableness." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, No. 23-975, 2025 WL 1520964, at *7–8 (U.S. May 29, 2025).[2]

---

[1] The Board has issued two sets of regulations that govern its review of railroad transactions—one set that applied before 2001, and another revised set that now covers most transactions. The Board determined that the pre-2001 regulations apply here, J.A. 213–15, as the merger falls into a narrow exception "waiv[ing] application of the [new] regulations," 49 C.F.R. § 1180.0(b). Under the applicable rules, the Board "assess[es] the impact of a railroad merger on the public interest" by "weigh[ing] the prospective gains in operating efficiency and marketing capability realized through consolidation against any consequent reduction in competition or in the provision of essential services." *Grainbelt Corp. v. Surface Transp. Bd.*, 109 F.3d 794, 796 (D.C. Cir. 1997); *see also* 49 C.F.R. § 1180.1(c) (2000).

[2] NEPA requires the Board to consider "environmental effects" in its EIS. 42 U.S.C. § 4332(2)(C)(i); *see also Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983). CPKC, as respondent-intervenor, disputes whether certain impacts—such as passenger-train delay, road-crossing delay, and pedestrian danger—qualify as "environmental" at all. CPKC's arguments may be

The Coalition claims that the Board's order was arbitrary and capricious because the Board (1) failed to adequately address the merger's environmental impacts under NEPA and (2) inadequately explained its ICCTA public-interest analysis. The Coalition, however, fails to identify any arbitrary reasoning. All told, the Board did a commendable job of addressing each of the Coalition's and other stakeholders' many comments. The Coalition may disagree with some of the Board's judgments, but it is not our role to second-guess the Board's reasonably explained choices.

## A

The Coalition principally challenges the EIS by claiming the Board used a flawed model to estimate post-merger delays at railroad crossings, and so wrongly concluded that those delays would be minor. But we will defer to an agency's choice of model so long as it bears a "rational relationship to the reality it purports to represent." *Am. Iron & Steel Inst. v. EPA*, 115 F.3d 979, 1005 (D.C. Cir. 1997) (per curiam) (internal quotation marks omitted). And here the Board's model was rationally designed, as it was constructed using straightforward equations "consistent with . . . [the] industry standard." J.A. 911; *see also* J.A. 855–58.

The Coalition challenges the Board's model in five ways. None persuade.

First, the Coalition disputes the Board's use of the railroad's posted "desired operating speeds" to estimate train speeds along each segment of track. *See* J.A. 797; J.A. 854. But the Coalition provides no evidence demonstrating that these "desired operating speeds" do not reflect actual train speeds. *See* Petitioner's Brief 16, 38–39. To the contrary, the Coalition submitted a study to the Board that assumed near-identical speeds of travel. *See* J.A. 717.

Second, the Coalition argues that the Board miscalculated the average train length by overweighting (shorter) passenger trains and underweighting (longer) freight trains. This challenge makes little sense. The Coalition does not contend that the Board input the wrong number of passenger trains (or misestimated the length of those trains); instead, it seems to contest the Board's use of a weighted average at all. But the Coalition provides no reason why the Board could not use an entirely ordinary weighted-average equation to calculate average train length.

Third, the Coalition claims the Board misestimated the lengths of the freight trains newly added to the line. The Board, however, reasonably adopted those numbers from estimates provided by CPKC, *see* J.A. 887, and the Coalition offers no specific basis to doubt the estimated lengths, *see* Petitioner's Brief 17, 39; Reply Brief 6–7. "[B]ecause [the Coalition] points to nothing suggesting that the information . . . was unreliable, the [Board] . . . was entitled to rely on . . . representations by" CPKC, which was "uniquely in a position to know the relevant information." *Am. Whitewater v. FERC*, 125 F.4th 1139, 1153 (D.C. Cir. 2025) (cleaned up).

---

substantial, but we have no occasion to address them here. The Coalition forfeited any claim that passenger-train delays are "environmental" by failing to adequately raise that issue in its opening brief. *See Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019); *cf. also* Petitioner's Brief 45–46. And because the Board's EIS considered and adequately addressed crossing delays and pedestrian strikes, we need not decide whether those harms are "environmental."

3

Fourth, the Coalition contends that the Board's model incorrectly presumed that train and vehicle traffic would flow uniformly, ignoring particularly congested periods (like rush hour). That argument is thinly discussed in the opening brief and so is potentially forfeited. *Cf.* Petitioner's Brief 16, 38–40. It fails even if properly raised. The Coalition never identifies how this "assumption" would mar the Board's model, nor answers the Board's reasonable explanation: When calculating the *daily-average* crossing-delay time, the Board input *daily-average* traffic levels into its model. *See* J.A. 922. It did not focus solely on rush-hour traffic or peak wait times because "train traffic does not necessarily coincide with peak vehicle traffic" and is "spread throughout the day." *Id.*

Finally, the Coalition argues that the Board's model was flawed because it did not rely on locality-specific data collected via field studies. Our cases, however, do not require that the Board use field studies; despite the Coalition's claims, there is no presumption that other sources of data are inaccurate. *See Vill. of Bensenville v. FAA*, 457 F.3d 52, 71 (D.C. Cir. 2006). And here, the Board explained why it decided not to rely on field-study data. The EIS "analyzed over one-thousand grade crossings spread across 1,724 miles," such that "[c]onducting site-specific traffic studies would have been impractical and unnecessary." J.A. 889. Moreover, a field study provides a mere snapshot of conditions and so is not overly useful for projecting the future impact of a merger (as the Board's model aimed to do). *See* J.A. 911–12.[3] The Board also responded to objections that its data was not local, explaining that it *did* rely on localized data. *See* J.A. 911. It estimated train speed, for example, by looking at posted speeds at each rail crossing. *See id.*; J.A. 838–42. It estimated the length and number of new trains for specific line segments. *See* J.A. 838–42. And it sourced traffic data for each individual crossing where that data was available. *See* J.A. 840–42; J.A. 853; J.A. 911.

## B

The Coalition makes several additional challenges to the EIS. None are more compelling.

To start, the Coalition claims the EIS disregarded an increased risk of pedestrian train strikes caused by higher freight-train traffic. But the EIS did consider that risk. It recounted existing measures designed to help prevent pedestrian strikes. *See* J.A. 898–99. And it concluded such strikes were unlikely, as there were no pedestrian fatalities on the relevant crossings between 2017 and 2021 (save for two suicides). *See* J.A. 804; J.A. 834.

The Coalition also argues that the Board acted arbitrarily by departing from existing policy or practice without adequate explanation. *See Jicarilla Apache Nation v. Dep't of Interior*, 613 F.3d 1112, 1119 (D.C. Cir. 2010). The Coalition, however, identifies no practice from which the Board might have departed. The Coalition highlights that the Board held fewer public meetings here than it did in one prior proceeding, which our court reviewed in *Village of Barrington v. Surface Transportation Board*, 636 F.3d 650 (D.C. Cir. 2011). And it notes that the Board in *Barrington* produced a particular traffic study that it omitted here. But the Coalition points to no policy (or even consistent practice) dictating that the Board hold a particular number of public

---

[3] The Board also reasonably discredited the Coalition's study, explaining (among other things) that its "reliance on such a limited sample size . . . increase[d] the chance of . . . skew[ed] results." J.A. 912.

4

meetings or produce any particular studies. The Board can also account for any purported departure. It held fewer public meetings (and relied more heavily on online meetings) because this merger was transcontinental, while the *Barrington* acquisition was focused on a single locality. *See* J.A. 892–93. And the Board prepared a traffic study in *Barrington* for fact-specific reasons that do not apply here. *See Vill. of Barrington v. Surface Transp. Bd.*, 892 F.3d 252, 260 (7th Cir. 2018); *cf. also* J.A. 889; J.A. 893; J.A. 912.[4]

The Coalition identifies no error in the Board's NEPA analysis. No additional explanation—in a supplemental EIS or otherwise—was therefore required.

### III

The Board also properly conducted the public-interest analysis required by the ICCTA.

The Coalition first challenges the Board's public-interest analysis by contending that the Board undercounted the number of new freight trains that the merger would add to the line, and therefore underestimated the total harm those trains would cause. But the Board reasonably credited CPKC's estimate that eight new trains would be added to the Coalition line. *See* J.A. 115; J.A. 386–87 ¶ 172 & n.73; J.A. 391 ¶ 241; J.A. 403. And the Board explained why it was unpersuaded by the Coalition's argument that more trains would be diverted onto the Coalition's line: Most importantly, the Board generally prohibited CPKC (with CPKC's assent) from rerouting trains in the way the Coalition fears. *See* J.A. 114–15; J.A. 173. The Board also noted that planned infrastructure upgrades reduced the likelihood of these diversions. *See* J.A. 116.

The Coalition further claims that the Board discounted the harms of longer commuter-train delays caused by those additional freight trains. The Board, however, explained in quite some detail why adding the new trains to the Coalition line would not increase delays to passenger trains: The line's infrastructure could accommodate the new trains, and the existing schedule included enough open off-peak windows for all eight trains. *See* J.A. 115; *see also* J.A. 470–79 ¶¶ 16, 19–21, 25. The "Trackage Agreement" between CPKC and the local commuter-rail company also commits CPKC to running its freight trains during those off-peak windows. J.A. 115.[5]

The Board adequately considered and reasonably assessed all relevant factors in the ICCTA analysis on which its final approval order rested.

---

[4] The Coalition's opening brief did not raise additional challenges to the EIS in a more than "skeletal" fashion, *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005), and so any other arguments—including those pertaining to first responders—were forfeited. *Cf.* Petitioner's Brief 18, 25–26, 45.

[5] The Coalition also claims that the Board ignored contrary evidence proving passenger-train delays would occur. But the Coalition fails to clearly identify any such evidence, *see* Petitioner's Brief 47–48, so the argument is forfeited, *see Schneider*, 412 F.3d at 200 n.1.

\* \* \*

For the foregoing reasons, we deny the petition for review.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for rehearing or rehearing en banc. *See* Fed. R. App. P. 41(b); D.C. Cir. R. 41(a)(1).

**Per Curiam**

**FOR THE COURT:**
Clifton B. Cislak, Clerk

BY:  /s/
Daniel J. Reidy
Deputy Clerk